UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SWAN SHEN,
    Plaintiff,

    v.                                    CIVIL ACTION NO.
                                           15-11593-MLW
CMFG LIFE INSURANCE COMPANY,
CUNA BROKERAGE SERVICES, INC.,
TIM HALEVAN and STEPHEN
MICHAEL COLLINS,
    Defendants.

**REPORT AND RECOMMENDATION RE:
DEFENDANTS' MOTION TO COMPEL ARBITRATION
AND STAY PROCEEDINGS
(DOCKET ENTRY # 18)**

**March 4, 2016**

**BOWLER, U.S.M.J.**

In this employment termination dispute, defendants CMFG Life Insurance Company ("CMFG"), CUNA Brokerage Services, Inc. ("CBSI"), Tim Halevan ("Halevan"), CBSI's chief compliance officer, and Stephen Michael Collins ("Collins"), a sales manager at CMFG, (collectively "defendants") seek to compel plaintiff Swan Shen ("Shen") to arbitrate counts III through VII in a seven count complaint and to stay this litigation during the pendency of the arbitration proceedings under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3-4.[1]  (Docket Entry # 18).  Shen opposes the motion both as to arbitration and a stay.  (Docket Entry #

---

[1]  Defendants limit the motion "to compel arbitration of Counts III-VII" (Docket Entry # 18) and acknowledge that "Shen is not required to arbitrate Counts I and II" (Docket Entry # 19, p. 12).

23).  After conducting a hearing, this court took the motion

(Docket Entry # 18) under advisement.

PROCEDURAL BACKGROUND

Shen, a Massachusetts resident, originally filed the

complaint in the Massachusetts Superior Court Department (Suffolk

County).  The claims all arise under state law.  The first two

counts consist of employment discrimination claims under

Massachusetts General Laws chapter 151B based on "national

origin, color, ancestry and/or race" (Count I) and gender (Count

II).  (Docket Entry # 8).  The remaining counts allege:  (1) a

failure to pay wages in violation of the Massachusetts Wage Act,

Massachusetts General Laws chapter 149 ("the Wage Act") (Count

III); (2) a breach of the covenant of good faith and fair dealing

(Count IV); (3) defamation (Count V); (4) an intentional

infliction of emotional distress (Count VI); and (5) an

intentional interference with contractual relations (Count VII).

On the basis of diversity jurisdiction, defendants removed

this action to the United States District Court for the District

of Massachusetts and filed an answer.  Without engaging in any

significant discovery (Docket Entry # 20), defendants filed the

motion to compel.

Briefly summarized, the complaint alleges that defendants

discriminated against Shen, an Asian female born in China, during

2

her employment as a financial advisor with CMFG.[2]  (Docket Entry # 8, ¶¶, 11-14, 95-108).  She was also a registered representative under the Financial Industry Regulatory Authority ("FINRA") with CBSI.  (Docket Entry # 8, ¶ 11).  After a successful career as a top financial advisor at CMFG, the company terminated her employment in August 2013 and refused to pay her previously earned incentive pay.  (Docket Entry # 8, ¶¶ 11, 14-18, 53, 60, 61, 83-86).  Halevan then drafted and CBSI filed a Uniform Termination Notice for Securities Industry Registration required by FINRA ("Form U-5")[3] containing purportedly false and defamatory reasons for the termination, namely, copying and pasting client signatures, altering forms and using consolidated

---

[2]  During oral argument, Shen clarified that CMFG was her employer, a position also taken in her memorandum opposing the motion (Docket Entry # 23, pp. 1-2).

[3]  Under FINRA and its predecessor, the National Association of Securities Dealers ("NASD"), "whenever a broker is terminated, the member firm that employed him must fill out and submit to the association a termination notice form (form U-5)." Baravati v. Josephthal, Lyon & Ross, Inc., 28 F.3d 704, 705 (7th Cir. 1994); accord Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc., 504 F.3d 189, 197 (1st Cir. 2007) (noting that, "Merrill Lynch filed a Uniform Termination Notice for Securities Industry Registration (Form U-5) with the NASD as required by NASD rules whenever a registered stockbroker leaves a firm"); Rosenberg v. MetLife, Inc., 493 F.3d 290, 290 (2nd Cir. 2007) (per curiam) (NASD "requires its members to file a termination form ('Form U-5') whenever they terminate a registered employee" and "form contains the employer's statement of the reasons for the termination"); Lobaito v. Financial Industry Regulation Authority, Inc., 2014 WL 4470423, at *4 (S.D.N.Y. Sept. 9, 2014) ("[w]henever a securities firm terminates a registered employee, the firm must file a Form U-5 with FINRA, stating the reason for termination (FINRA By-Laws, Article V, Sec. 3"), aff'd, 599 Fed.Appx. 400 (2nd Cir. 2015) (unpublished), cert. denied, 136 S.Ct. 570 (2015).

customer statements without pre-approval.  (Docket Entry # 8, ¶¶ 65, 69-73, 126, Ex. A).  During her employment, CMFG repeatedly denied her a full-time assistant even though advisors at her level typically had one, if not two, full-time assistants.  (Docket Entry # 8, ¶¶ 19-22).  After her termination, CMFG replaced her "with two white male employees" having either more customer complaints or less job stability than Shen.  (Docket Entry # 8, ¶ 58).

BACKGROUND

In March 2001, Shen began working in Waltham, Massachusetts as a financial advisor at a credit union for CMFG.  (Docket Entry # 8, ¶¶ 11, 13) (Docket Entry # 8, p. 30).[4]  CMFG requires its financial advisors to register with CBSI, "a FINRA-registered broker/dealer that . . . provides brokerage services to credit union members."  (Docket Entry # 8, ¶¶ 7, 11) (Docket Entry # 21, ¶ 7).  FINRA, the successor entity to NASD, "is a self-regulatory organization and national securities association that is registered with the Securities and Exchange Commission."  WC Capital Mgmt., LLC v. UBS Securities, LLC, 711 F.3d 322, 326 n.2 (2nd Cir. 2013); (Docket Entry # 21, ¶¶ 3, 4).  As a FINRA-registered broker/dealer (Docket Entry # 8, ¶ 7) (Docket Entry # 21, ¶¶ 3, 4), CBSI was a "member" of FINRA.  See FINRA Rule

_____

[4]  Unless otherwise noted, page numbers refer to the docketed page number as opposed to the actual document's page number.

13100(o), http://www.finra.org/industry/finra-rules (henceforth
"FINRA Rules" or "FINRA Rule") (defining a "member" as "any
broker or dealer admitted to membership in FINRA").

All persons engaged "in the investment banking or securities
business of a member" must register with NASD or its successor,
FINRA. See FINRA Rule 1031(a) ("[a]ll persons engaged or to be
engaged in the investment banking or securities business of a
member who are to function as representatives shall be registered
as such with NASD"); (Docket Entry # 21, ¶ 5). As part of her
employment with CMFG, Shen therefore became "a FINRA-registered
representative with [CBSI]." (Docket Entry # 8, ¶ 11).

The registration process entailed completing a Uniform
Application for Securities Industry Registration or Transfer form
("Form U-4"), which contains an arbitration clause. (Docket
Entry # 21, ¶ 8) (Docket Entry # 21-3). Prior to completing the
form, Shen authorized CBSI to review her record with the central
licensing and registration depository for the United States
securities industry and its regulators ("CRD"). See
http://www.finra.org/industry/crd (FINRA operates "central
licensing and registration system for the U.S. securities
industry and its regulators," which contains "qualification,
employment and disclosure histories of more than 643,320 active
registered individuals"); (Docket Entry # 21, ¶ 8). On January
22, 2001, Shen signed an NASD/CRD Authorization form ("CRD

Form"). (Docket Entry # 21-2). The CRD Form includes the

following language advising Shen that the Form U-4 contained an

arbitration clause:

> Before signing the U-4, you should understand the following:
> (1) You are agreeing to arbitrate any dispute, claim or
> controversy that may arise between you and your firm, or a
> customer, or any other person, that is required to be
> arbitrated under the rules of the self-regulatory
> organizations with which you are registering.  This means
> you are giving up the right to sue a member, customer, or
> another associated person in court, including the right to a
> trial by jury, except as provided by the rules of the
> arbitration forum in which a claim is filed.

(Docket Entry # 21-2). The form additionally advised Shen that

an employment discrimination claim "is not required to be

arbitrated under NASD rules." (Docket Entry # 21-2).

On March 21, 2001, Shen signed the Form U-4. (Docket Entry

# 21-3, pp. 10-11). The form, signed by Shen and submitted by

CBSI to NASD, includes the following arbitration clause:  "I

agree to arbitrate any dispute, claim or controversy that may

arise between me and my firm, or a customer, or any other person,

that is required to be arbitrated under the rules, constitutions,

or by-laws of the [self-regulatory organizations] indicated in

Item 11 as may be amended from time to time." (Docket Entry #

21-3, pp. 1, 9) (Docket Entry # 21, ¶ 11). Shen identified NASD

as the applicable self-regulatory organization ("SRO"). NSAD

"changed its name to FINRA in 2007, but otherwise maintained its

function and rules as a self-regulatory organization." (Docket

Entry # 21, ¶ 4). FINRA Rule 13201 excludes employment

discrimination claims from mandatory arbitration, i.e., counts I and II.[5]

Notwithstanding Shen's status as a FINRA-registered representative with CBSI, she was an employee of CMFG. (Docket Entry # 8, ¶¶ 11, 13) (Docket Entry # 21, ¶ 6). Throughout her employment at CMFG, she "was one of the top financial advisors at" the company. (Docket Entry # 8, ¶ 14). Indeed, she built a customer base at the credit union with assets totaling approximately $163 million. (Docket Entry # 8, ¶ 15). During her tenure, she had only one customer complaint, which CMFG denied as without merit. (Docket Entry # 8, ¶ 16).

---

[5] Plaintiff does not consent to arbitrate counts I and II and the parties agree that these counts are therefore not subject to arbitration. FINRA Rule 13201(a) provides as follows:

(a) Statutory Employment Discrimination Claims

A claim alleging employment discrimination, including sexual harassment, in violation of a statute, is not required to be arbitrated under the Code. Such a claim may be arbitrated only if the parties have agreed to arbitrate it, either before or after the dispute arose. If the parties agree to arbitrate such a claim, the claim will be administered under Rule 13802.

Furthermore, under the arbitration clause, Shen agreed to arbitrate disputes under the NASD rules "as may be amended from time to time." (Docket Entry # 21-3, p. 9, ¶ 5). Likewise, in another of the ten paragraphs immediately preceding Shen's signature in Form U-4, she agreed "to comply with all" of the rules of the SRO with which she sought registration, i.e., NASD, "as they are or may be adopted, or amended from time to time." (Docket Entry # 21-3, p. 9, ¶ 2). She therefore agreed not only to the above-quoted FINRA arbitration rule but also to the arbitration rules of NASD and thereafter FINRA, including FINRA Rules 13200(a) and 13803(f).

During her employment, Shen was a member of the senior advisor leadership team ("SALT") based on her seniority and annual performance.  As a member of SALT, She was "entitled to receive annual business stipends."  (Docket Entry # 8, ¶¶ 27-28) (Docket Entry # 21-1, p. 16).  A registered representative agreement sets out the calculation.  (Docket Entry # 21-1, p. 16).  Although eligible for SALT in 2009, 2010 and 2011, "Collins prevented her membership."  (Docket Entry # 8, ¶ 31).

Shen was the only Asian female financial advisor working for CMFG throughout the "country out of nearly 500 financial advisors."  (Docket Entry # 8, ¶ 23).  Typically, financial advisors have one or two full-time assistants.  (Docket Entry # 8, ¶ 21).  Shen had only a single part-time assistant.  (Docket Entry # 8, ¶ 19).

Eight months before the termination, "CUNA," i.e., CBSI or CMFG,[6] issued "a Corrective Action Notice and Letter of Concern" to Shen "because of signature concerns and form alterations." (Docket Entry # 8, n.2).  Shen promptly admitted to the conduct and thereafter "obtained [the] affected clients' signatures on the proper forms."  (Docket Entry # 8, n.2).  In early August 2013, FINRA sent Shen a letter dated August 2, 2013 regarding her use of a document she had created for client meetings captioned

---

[6]  The complaint refers to "CUNA," a term it defines as CBSI and CMFG.  (Docket Entry # 8, n.1).

"Periodic Review Meeting Agenda." (Docket Entry # 8, ¶ 32). Shen had stopped using the document and providing it to clients in December 2012. (Docket Entry # 8, ¶ 47). On or about August 4, 2013, she quickly resolved the matter with FINRA "by agreement." (Docket Entry # 8, n.3).

On August 28, 2013, Collins and his supervisor came into Shen's office, handed her a termination letter and "informed her that they had removed her registration with" CBSI. (Docket Entry # 8, ¶¶ 53-55). After Shen's termination, Halevan drafted and CBSI filed the Form U-5 with the aforementioned reasons for the termination. (Docket Entry # 8, ¶¶ 65, 69-70, 126 & Ex. A) (Docket Entry # 21, ¶ 14). After terminating her employment, CBSI replaced Shen with two white male employees.

Under the registered representative agreement, "Shen was entitled to receive" certain incentive pay. (Docket Entry # 8, ¶¶ 78, 80) (Docket Entry # 21-1). Shen earned incentives based on procuring new business as well as retaining existing accounts. Upon her termination, she had completed all of the work to earn the incentive pay. Collins, however, informed her she would not receive it because she no longer worked for the company.

Collins and Halevan each signed Form U-4s requesting registration with NASD, the identified SRO in the forms. (Docket Entry ## 21-4, 21-5). Like Collins, Halevan is also an employee of CMFG. (Docket Entry # 21, ¶ 13).

DISCUSSION

In addition to a number of subsidiary arguments, defendants contend that:  (1) CBSI, Halevan and Collins are entitled to invoke the arbitration clause and compel arbitration; (2) Shen is bound by the arbitration clause; and (3) counts III through VII fall within the scope of the arbitration clause.  (Docket Entry ## 19, 31).  Shen seeks to deny the motion to compel arbitration in its entirety.  She agrees, however, that she signed Form U-4 and that CBSI is a "member" and she is an "associated person" under FINRA rules.  (Docket Entry # 23).  The parties also agree that counts I and II are not subject to mandatory arbitration. (Docket Entry # 19, pp. 5, 12) (Docket Entry # 23, pp. 4-5) (Docket Entry # 31, n.1).[7]  Defendants additionally assert that CMFG may join in the arbitration that the foregoing defendants can compel.

I.  <u>Compelling Arbitration of Counts III to VII</u>

Ordinarily, whether the parties agreed to submit a dispute to arbitration is "an 'issue for judicial determination.'" <u>Granite Rock Co. v. Int'l Bhd. of Teamsters</u>, 561 U.S. 287, 296 (2010) ("whether parties have agreed to 'submi[t] a particular dispute to arbitration' is typically an '"issue for judicial determination"'"); <u>Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.</u>, 638 F.3d 367, 375 (1st Cir. 2011); <u>cf. Awuah v. Coverall</u>

---

[7]  <u>See</u> fn. one.

N.Am., Inc., 554 F.3d 7, 10 (1st Cir. 2009) (where parties
"'clearly and unmistakably agreed' that the arbitrator should
decide whether an issue is arbitrable, the Supreme Court has held
that this issue is to be decided by the arbitrator"). 
Arbitration is a matter of contract, see Rent-A-Center, West,
Inc. v. Jackson, 561 U.S. 63, 67 (2010) ("FAA reflects the
fundamental principle that arbitration is a matter of contract");
Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d at 376,
and, as accurately pointed out by Shen, it "'is strictly a matter
of consent.'"  Granite Rock Co. v. Int'l Bhd. of Teamsters, 561
U.S. at 299.  Thus, arbitration is a way to resolve "*only those
disputes* that the parties have agreed to submit to arbitration."
Id. (hyphen omitted and emphasis in original); Dialysis Access
Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d at 376.

     In order to compel arbitration in this circuit, "defendants
'must demonstrate that a valid agreement to arbitrate exists,
that they are entitled to invoke the arbitration clause, that the
other party is bound by that clause, and that the claim asserted
comes within the clause's scope.'"  Grand Wireless, Inc. v.
Verizon Wireless, Inc., 748 F.3d 1, 6 (1st Cir. 2014) (quoting
Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640
F.3d 471, 474 (1st Cir. 2011)) (internal quotation marks and
brackets omitted).  The third requirement is satisfied because
Shen is a signatory to Form U-4, which contains the arbitration

clause.  She therefore agreed to be bound by the clause.  <u>See</u> <u>Thomas James Associates, Inc. v. Jameson</u>, 102 F.3d 60, 65 n.2 (2nd Cir. 1996) ("Jameson is bound by the Form U-4 because his signature manifests his assent").  Although Shen repeatedly points out that the form is 14 years old, there is no evidence that Shen rescinded the form or that it does not apply under the circumstances.  Accordingly, this court turns to the remaining requirements.

A.  <u>Validity</u>

"'[P]rinciples of state contract law control the determination of whether a valid agreement to arbitrate exists.'" <u>Gove v. Career Sys. Dev. Corp.</u>, 689 F.3d 1, 4 (1st Cir. 2012). Defendants cite and rely on Massachusetts law and Shen does not dispute its applicability.[8]

Validity addresses the validity of the arbitration agreement

---

[8]  Form U-4 identifies Shen's residence as located in Massachusetts.  She also worked in Waltham, Massachusetts.  In light of the parties' apparent agreement and the reasonable relationship of Massachusetts to the dispute, this court applies Massachusetts contract law where appropriate.  <u>See</u> <u>Danny B. ex rel. Elliott v. Raimondo</u>, 784 F.3d 825, 831 (1st Cir. 2015) (citing <u>Borden v. Paul Revere Life Ins. Co.</u>, 935 F.2d 370, 375 (1st Cir. 1991), as "holding that federal court sitting in diversity may accept parties' reasonable agreement concerning choice of law"); <u>Barclays Bank PLC v. Poynter</u>, 710 F.3d 16, 21 (1st Cir. 2013) (using Massachusetts law chosen by parties given "at least a reasonable relationship between this dispute and Massachusetts"); <u>see</u>, <u>e.g.</u>, <u>Campbell v. Gen. Dynamics Gov't Sys. Corp.</u>, 407 F.3d 546, 555 n.6 (1st Cir. 2005) (addressing Form U-4 and explaining that, "parties do not dispute the district court's seemingly reasonable application of Massachusetts law, and we are free to accept their implicit concession").

or clause as opposed to the entire contract in which it appears. See Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 449 (2006) ("challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator"); Farnsworth v. Towboat Nantucket Sound, Inc., 790 F.3d 90, 96 (1st Cir. 2015) (distinguishing validity challenge to entire contract from validity challenge to "specific agreement to resolve the dispute through arbitration" with latter being resolved by court); Garcia v. E.J. Amusements of New Hampshire, Inc., 103 F.Supp.3d 168, 169 (D.Mass. 2015). Validity encompasses the formation of the parties' arbitration agreement. See Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. at 296 ("where the dispute at issue concerns contract formation, the dispute is generally for courts to decide"); see also BG Group PLC v. Republic of Argentina, 134 S.Ct. 1198, 1206-07 (2014) (paraphrasing Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. at 299-300). Because arbitration is a matter of contract, a valid arbitration agreement requires plaintiff's assent. Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d at 552 (addressing validity in context of waiver of federal statutory claim and stating, there is no agreement "in the absence of an agreement signifying an assent").

A valid and enforceable contract under Massachusetts law exists when the parties agree to "the material terms" and "have a

present intention to be bound by that agreement." Situation
Management Sys., Inc. v. Malouf, Inc., 724 N.E.2d 699, 703 (Mass.
2000); see Cyganiewicz v. Sallie Mae, Inc., 2013 WL 5797615, at
*3 (D.Mass. Oct. 24, 2013) (determining validity of arbitration
agreement under Massachusetts law and explaining that valid
"contract is formed if there is an agreement between the parties
on the material terms of the agreement and the parties have a
present intention to be bound by that agreement"). In other
words, there must be a meeting of the minds to create a valid
arbitration agreement. See Marino v. Tagaris, 480 N.E.2d 286,
290 (Mass. 1985); see also Vadnais v. NSK Steering Sys. Am.,
Inc., 675 F.Supp.2d 205, 207 (D.Mass. 2009) (in Massachusetts,
"essential elements of a contract are an offer, acceptance, and
an exchange of consideration or meeting of the minds"); see
generally Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa &
Casino, 640 F.3d at 475 (examining validity of arbitration
agreement under Puerto Rico law, namely, a bilateral obligation
based on mutual promises exchanged).

Here, Form U-4 contains ten, separately numbered paragraphs
immediately above Shen's signature. (Docket Entry # 21-3, pp. 9-
10). Paragraph five contains the arbitration clause. (Docket
Entry # 21-3, p. 9, ¶ 5). The clause begins with the language,
"I agree to arbitrate" thereby evidencing a present intention to
be bound by the agreement to arbitrate. See Targus Group Int'l,

Inc. v. Sherman, 922 N.E.2d 841, 851 (Mass.App.Ct. 2010) (use of verb "'agree'" in "the present tense . . . . embodies a current intent of all signatories" to be bound).  As a condition of her employment as a financial advisor with CMFG, Shen had to apply for registration with NASD through CBSI.  (Docket Entry # 21, ¶ 8) (Docket Entry # 8, ¶ 11).  In agreeing to the arbitration clause in Form U-4, she obtained the benefits of registration with NASD thus providing consideration for her agreement to arbitrate disputes.  Viewed as an agreement between Shen and NASD, see In re Prudential Ins. Co. of America Sales Practice Litigation, 133 F.3d 225, 230 (3rd Cir. 1998), or the firm, CBSI, see Marciano v. MONY Life Ins. Co., 470 F.Supp.2d 518, 532 (E.D.Pa. Jan. 22, 2007), Shen's agreement to arbitrate is valid and enforceable.

B.  <u>CBSI, Halevan and Collins' Entitlement to Invoke Arbitration Clause</u>

Defendants maintain that CBSI, Halevan and Collins may each invoke the arbitration clause and that CMFG may join in the arbitration proceeding.[9]  They submit that CBSI, Halevan and Collins are third-party beneficiaries of Form U-4 and, as to CBSI, additionally contend that CBSI can enforce the arbitration

_____

[9]  The latter argument is addressed in Roman numeral II.

clause as a "member" of FINRA.[10]  They also maintain that Halevan
and Collins, as registered agents of CBSI, can invoke the clause
under principles of agency.  Shen asserts that Halevan and
Collins were neither third-party beneficiaries of the arbitration
clause in Form U-4 nor agents of CBSI.

"In order to compel arbitration of the claims against" them,
CBSI, Halevan and Collins "must establish that" that they are
"'entitled to invoke the arbitration clause.'"  Grand Wireless,
Inc. v. Verizon Wireless, Inc., 748 F.3d at 9 (quoting Soto-
Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d
at 474).  In this diversity action, state law governs the
enforceability of the agreement to arbitrate in Form U-4.  See
id. at 12 n.26 (applying the state law that "governs the
contract" as opposed to "general principles of state contract
law"); cf. InterGen N.V. v. Grina, 344 F.3d 134, 143 (1st Cir.
2003) (applying federal common law in federal question case
involving motion to compel arbitration among foreign and domestic
companies).

Thus, with respect to defendants' argument that CBSI,
Halevan and Collins were third-party beneficiaries of the
agreement to arbitrate in Form U-4, Massachusetts law applies.
See Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d at

---

[10]  Defendants do not argue that CBSI was a signatory of
Form U-4 and, as such, entitled to invoke the arbitration clause.

12 ("<u>Carlisle</u>[11] holds that, at least as a general principle,
state law governs the inquiry as to whether a non-party to an
arbitration agreement can assert the protection of the
agreement"). As further noted in <u>Carlisle</u>, "'traditional
principles' of state law allow a contract to be enforced by . . .
nonparties to the contract through . . . third-party beneficiary
theories . . .." <u>Grand Wireless, Inc. v. Verizon Wireless, Inc.</u>,
748 F.3d at 12 (quoting <u>Carlisle</u>, 556 U.S. at 631). Under
Massachusetts law, "a plaintiff seeking to enforce a contract as
a third-party beneficiary must demonstrate '*from the language and
circumstances of the contract* that the parties to the contract
clearly and definitely *intended* the beneficiaries to benefit from
the promised performance.'" <u>Alicea v. Machete Music</u>, 744 F.3d
773, 784 (1st Cir. 2014) (emphasis added and internal citation
omitted); <u>Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.</u>,
918 N.E.2d 36, 44 (Mass. 2009); <u>Restatement (Second) of Contracts</u>
§ 304 (1981).

Turning to the relevant language in Form U-4 and whether
Shen intended to give CBSI, Halevan and Collins the benefit of
her promise to arbitrate certain disputes, she "agree[d]" to
arbitrate any dispute "that may arise between me and my firm,"
i.e., CBSI, "or any other person," i.e., Halevan and Collins,
"that is required to be arbitrated under the rules" of NASD and

---

[11]   <u>Arthur Andersen LLP v. Carlisle</u>, 556 U.S. 624 (2009).

FINRA.[12]  (Docket Entry # 21-3, p. 9, ¶ 5).  As noted above,

CBSI, a FINRA-registered broker/dealer (Docket Entry # 8, ¶ 7)

(Docket Entry # 21, ¶¶ 3, 4), was a "member" of FINRA.  See FINRA

Rule 13100(o).[13]  Halevan and Collins, both registered

representatives of CBSI (Docket Entry ## 21-4, 21-5) (Docket

Entry # 21, ¶ 13), were "[a]ssociated [p]erson[]."  See FINRA

Rule 13100(a), (r).[14]  Shen was also an "associated person."

Under FINRA Rule 13803(f), "If a . . . current or former

associated person[,]" i.e., Shen, "files in court a claim against

a member or a current or former associated person that includes

matters that are subject to mandatory arbitration, . . . by the

rules of FINRA . . ., the defending party may, upon motion,

compel arbitration of the claims that are subject to mandatory

arbitration."[15]  FINRA Rule 13200(a) sets out the claims that are

---

[12]  As explained in footnote five, she therefore agreed not
only to FINRA Rule 13201(a) but also to the arbitration rules of
NASD and thereafter FINRA, including FINRA Rules 13200(a) and
13803(f).  In a separate paragraph, she reiterated her agreement
"to comply with" NASD Rules "as they are or may be adopted, or
amended from time to time" thereby lending further support to the
intended reach of her agreement as encompassing a compliance with
the FINRA arbitration rules at issue here.  (Docket Entry # 21-3,
p. 9, ¶ 2).

[13]  FINRA Rule 13100(o) defines a "member" as "any broker or
dealer admitted to membership in FINRA."

[14]  FINRA Rule 13100(r) defines a "person associated with a
member" as "[a] natural person who is registered or has applied
for registration under the Rules of FINRA."

[15]  FINRA Rule 13802 also addresses options available to a
defendant when an associated person, such as Shen, files
statutory discrimination claims in court and related claims in

subject to such mandatory arbitration.  Captioned "*Required
Arbitration*," the rule states that "a dispute *must* be arbitrated"
if it "arises out of the business activities of a member or an
associated person and *is between or among*:  Members; *Members and
Associated Persons*; or *Associated Persons*."  FINRA Rule 13200(a)
(emphasis added and bullet points omitted).

The foregoing language of the arbitration provision in Form
U-4 and in FINRA Rules 13200(a) and 13803(f) therefore lead to
the conclusion that CBSI, Halevan and Collins are third-party
beneficiaries of Shen's promise to arbitrate claims between her
and her "firm" (CBSI) "or any other person" (Halevan and Collins)
under FINRA Rules.  (Docket Entry # 21-3).  The FINRA Rules under
which Shen agreed to arbitrate allow a member (CBSI) or an
associated person (Halevan and/or Collins) named as a defendant
in court to compel arbitration of claims subject to mandatory
arbitration, i.e., non-employment discrimination claims that
arise out of the business activities of an associated person
(Shen) and other associated persons or members.  See FINRA Rules
13200, 13803(f).  The language therefore evidences a clear intent
by Shen to give these defendants the benefit of the promised
performance of submitting mandatory arbitration claims to
arbitration.

Although Shen relies on InterGen N.V. v. Grina, 344 F.3d at

_____

arbitration at FINRA.  See FINRA Rule 13803(a), (d).  Neither
subsection (a) nor (d) apply because Shen did not file any
related claims in arbitration at FINRA.

146, as a means to avoid third-party beneficiary status, the language of the arbitration clauses in InterGen applied to disputes "'between Buyer and Seller'" and conferred buyer's rights on "the 'Owner.'" Id. at 146-47. The documents containing the arbitration clauses defined the entities that comprised these terms and the definitions did not include InterGen N.V. Id. In contrast, the far broader language of the arbitration clause in Form U-4 extends to "any other person" and includes NASD rules as "amended from time to time." (Docket Entry # 21-3).

Indeed, applying a similar NASD Rule in Weston Securities Corp. v. Aykanian, 703 N.E.2d 1185 (Mass.App.Ct. 1998), which allowed the non-signatory defendant customers to demand arbitration, see id. at 1187, 1190, in the context of the defendants' agreement to arbitrate disputes in Form U-4s, the Weston court deemed the customers third-party beneficiaries. Id. at 1190; see also In re Prudential Ins. Co. of America Sales Practice Litigation, 133 F.3d at 229-30 (applying same reasoning to find that nonsignatory employer "'firm'" under Form U-4 was intended beneficiary). Thus, like the plaintiffs in Weston who, by signing Form U-4 "agreed to arbitrate 'any dispute, claim or controversy that may arise between me and . . . a customer . . . that is required to be arbitrated' under the NASD code," Weston Securities Corp. v. Aykanian, 703 N.E.2d at 1190, Shen, by signing Form U-4, agreed to arbitrate "any dispute, claim or

20

controversy that may arise between me and my firm [CBSI], or . .
. any other person [Halevan and Collins], that is required to be
arbitrated" under FINRA Rules.  (Docket Entry # 21-3).  Similar
to the NASD Rule which required arbitration of "'[a]ny dispute,
claim, or controversy . . . between a customer and a member
and/or associated person arising in connection with the business
of such member or in connection with the activities of such
associated person . . . upon the demand of the customer'" in
Weston, id. (emphasis omitted), FINRA Rule 13200(a) mandates
arbitration of a dispute that "arise[s] out of the business
activities of . . . an associated person and is between . . .
Members and Associated Persons" or "Associated Persons" and FINRA
Rule 13803(f) states that the member (CBSI) or the associated
person (Halevan or Collins) may compel arbitration of claims that
are subject to mandatory arbitration, i.e., those claims set out
in FINRA Rule 13200(a).

The Third Circuit in Prudential adhered to similar reasoning
in concluding that Form U-4 intended to benefit the non-signatory
employer of the plaintiff, which was also a member of NASD.  See
In re Prudential Ins. Co. of America Sales Practice Litigation,
133 F.3d at 229-30.  The relevant portion of the decision reads
as follows:

> As stated in Form U-4, the plaintiffs agreed to arbitrate
> any dispute not only with Pruco, but also with "any other
> person" where the claim itself would be subject to
> arbitration under the NASD Code.  Pursuant to section 8 of
> the NASD Code, plaintiffs agreed to arbitrate certain
> disputes "between or among members and/or associated persons
> . . .."  There is no question that Prudential is a member of
> the NASD, and the plaintiffs are associated persons within

the meaning of the Code.  Thus, we conclude, as did the
district court, there is a clear and unequivocal intent to
arbitrate claims with third parties such as Prudential, and
not just Pruco, to the extent they are eligible for
arbitration under § 1 . . ..

Moreover, it is clear from the text and purpose of Form U-4,
that the parties to the agreement intended to benefit such
non-signatory, third parties as Prudential . . . The
intention, as Form U-4 unambiguously indicates, was not
limited to arbitrating disputes between the NASD and the
applicant or member "firms" explicitly recognized in the
text.  Rather, the arbitration agreement and the NASD Code
of Arbitration establish certain classes of individuals—
member firms of the NASD, customers, and so on—who would
benefit from the applicant's agreement with the NASD.

Id.

In sum, the language and the circumstances manifest a clear
intent by Shen to confer the benefit of arbitration directly to
members and associated persons for mandatory arbitration claims
arising out of Shen's business activities between herself and a
member and/or associated person.  Shen therefore intended to give
the benefit of the promised performance of arbitration for such
claims to members and associated persons, namely, CBSI, Halevan
and Collins.[16]  CBSI, Halevan and Collins are therefore intended
beneficiaries under Massachusetts law of Shen's agreement to
arbitrate those disputes.[17]  Accordingly, this court turns to the
fourth requirement.

---

[16]  The disputes are not limitless.  For example, Shen did
not intend to confer the benefit of arbitration for claims that
did not arise out of business activities thus excluding private
disputes or hobbies.  See generally Osborne v. Wells Fargo
Advisors, LLC, 2012 WL 2952533, at *3 (M.D.Fla. July 19, 2012).

[17]  It is therefore not necessary to address defendants'
argument that Halevan and Collins acted as agents of CBSI or
their alternative argument with respect to CBSI.

22

## C.   Counts III to VII as Subject to Arbitration

Defendants next maintain that the claims in counts III through VII fall within the scope of the arbitration clause. According to defendants, the factual allegations supporting these claims implicate the business activities of CBSI, Halevan, Collins and/or Shen.   (Docket Entry # 19).

The final requirement for CBSI, Halevan and Collins to compel arbitration is that the claims must fall within the scope of the arbitration clause.   See Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d at 6 ("[t]o compel arbitration, the defendants 'must demonstrate . . . that the claim asserted comes within the clause's scope'"); Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d at 379.   "To determine whether" the "claims fall within the scope of the arbitration clause," the proper focus is "'on the factual allegations underlying the claims in the complaint.'"   Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d at 7 (brackets omitted).

Ambiguities about whether the terms of an arbitration clause cover a dispute are resolved in favor of arbitration.   See Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d at 7 ("'"ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration"'"); Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d at 379.   More specifically, in the event of an ambiguity, the "presumption in favor of arbitration applies unless the party opposing

23

arbitration rebuts it." Grand Wireless, Inc. v. Verizon
Wireless, Inc., 748 F.3d at 7; see also Dialysis Access Ctr., LLC
v. RMS Lifeline, Inc., 638 F.3d at 379 (presumption applies if
"Arbitration Clause 'is ambiguous about whether it covers the
dispute at hand'" and "'only where the presumption is not
rebutted'") (quoting Granite Rock Co. v. Int'l Bhd. of Teamsters,
561 U.S. at 301).  At a minimum, rebutting an ambiguity requires
Shen to show an intent to exclude the type of dispute at issue
from the scope of the arbitration clause.  See Grand Wireless,
Inc. v. Verizon Wireless, Inc., 748 F.3d at 8-9.  Under
Massachusetts law, an "ambiguity arises only if a reasonable
person could read the provision more than one way." HSBC Realty
Credit Corp. (USA) v. O'Neill, 745 F.3d 564, 574 (1st Cir. 2014)
(citing Brigade Leveraged Capital Structures Fund Ltd. v. PIMCO
Income Strategy Fund, 995 N.E.2d 64, 69 (Mass. 2013)); see also
Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d at 379
(applying Puerto Rico law to define what constitutes an
ambiguity).

Examining the factual allegations of the complaint, Shen
alleges that she earned incentive pay and, upon terminating her
employment, defendants refused to pay her the earned incentive
pay.  These allegations form the basis of the Wage Act claim and
the breach of good faith and fair dealing claim, which alleges
that defendants terminated Shen "to avoid paying her compensation

earned" (Docket Entry # 8, ¶ 119).  To state the obvious, payment
or non-payment of compensation is a fundamental aspect of
"business activities."  See, e.g., Hawkins v. Toussaint Capital
Partners, LLC, 2010 WL 2158332, at *5 (S.D.N.Y. May 27, 2010);
accord Osborne v. Wells Fargo Advisors, LLC, 2012 WL 2952533, at
*4 (M.D.Fla. July 19, 2012) ("[d]isputes concerning employee
compensation are an arbitrable dispute arising out of a business
activity").  The factual allegations that defendants failed to
pay Shen past earned compensation thus invariably constitute
"business activities" of "associated persons," i.e., Shen,
Collins and/or Halevan, within the meaning of FINRA Rule
13200(a).  The terms of the arbitration clause adhere to disputes
"required to be arbitrated under the rules" of NASD as "amended
from time to time" (Docket Entry # 21-3, p. 9, ¶ 5) and FINRA
Rule 13200(a) sets out the disputes that "must be arbitrated."
FINRA Rule 13200(a) (captioned "Required Arbitration").  Hence,
there is little doubt that the factual allegations underlying the
claims in counts III and IV fall within the scope of the
arbitration clause.  See, e.g., French v. Wells Fargo Advisors,
LLC, at *5 (D.Vt. Feb. 14, 2012); Hawkins v. Toussaint Capital
Partners, LLC, 2010 WL 2158332, at *5 (interpreting scope of Form
U-4 arbitration clause and finding that, "Hawkins's factual
allegations that Toussaint refused to pay him commissions earned
during his employment and discharged him for requesting these

commissions form the factual bases" for, inter alia, wilful failure to pay commissions claim and "clearly fall within the scope of the parties' 'business activities'").

The factual allegations of the complaint also depict that Collins drafted Form U-5 and that defendants knew that the reasons for the termination stated in the form were not true. Instead, the true reasons for the termination consisted of "discriminatory and unlawful reasons." (Docket Entry # 8, ¶¶ 70, 72). Thus, "rather than have FINRA conduct further inquiry with" CBSI and CMFG, "[d]efendants 'offered up' their Asian female advisor to FINRA." (Docket Entry # 8, ¶ 74). As a result of the false reasons for the termination in Form U-5, Shen "has been unable to work as an advisor since August 2013" and "lost all of her clients." (Docket Entry # 8, ¶¶ 76-77). The false statements in Form U-5 provide the underlying basis for the defamation claim in Count V. (Docket Entry # 8, ¶ 126). They also support the intentional infliction of emotional distress claim in Count VI and the intentional interference of contract claim in Count VII. (Docket Entry # 8, ¶ 143) ("Collins and Halevan knowingly induced CUNA to break that employment relationship when they decided to intentionally falsify the reasons for Plaintiff's termination").

Publishing false reasons for an employee's termination "arises out of the business activities" of a member (CBSI) and/or

26

an associated person (Collins, Halevan and/or Shen).  The false reasons (cutting and pasting client signatures, altering forms and creating customer statements and providing them to clients) all depict alleged conduct that took place during Shen's employment.  The factual allegations regarding the true as well as the false reasons for the termination are "between or among" a member and associated persons or "between or among" associated persons within the meaning of FINRA Rule 13200(a).  The factual allegations underlying the defamation claim in Count V, the intentional infliction of emotional distress claim in Count VI and the interference with contractual relations claim in Count VII therefore fall within the scope of the arbitration clause. See, e.g., Kouromihelakis v. Hartford Fire Ins. Co., 48 F.Supp.3d 175, 185 (D.Conn. 2014) (defamation claim based on filing Form U-5 with false statements about terminated employee fell within scope of Form U-4's arbitration clause and FINRA Rule 13200); Johnson v. Charles Schwab & Co., Inc., 2010 WL 678126 (S.D.Fla. Feb. 25, 2010) (defamation and intentional infliction of emotional distress claims based on false statements by former employer, a FINRA member, describing former employee fell within scope of arbitration clause in Form U-4).

Finding no ambiguity as to the scope of the arbitration clause vis-à-vis the claims in counts III through VII, they are subject to arbitration.  Even assuming dubitánte the existence of

an ambiguity, Shen fails to rebut it.

In sum, having demonstrated all four requirements, CBSI, Halevan and Collins may compel Shen to arbitrate the claims in counts III through VII.

## II. CMFG's Joinder

Turning to CMFG, defendants do not argue that CMFG is entitled to invoke and therefore compel arbitration.  Rather, they maintain that CMFG may *join* in the arbitration that CBSI can compel because CMFG is "closely affiliated with the other defendants" and "all of Shen's claims against CMFG are intertwined with her claims against the other defendants."[18] (Docket Entry ## 19, 31).

In response, Shen correctly posits that CMFG, as a corporation, is not an "associated person."  CMFG is not a "natural person" and, as a corporate entity, falls outside the plain language of FINRA Rule 13100(r) limiting an associated person to a natural person.  Case law confirms this interpretation.  See Ladd v. Scudder Kemper Investments, Inc.,

---

[18]  To support the joinder argument in the initial supporting memorandum, defendants cited:  (1) Ladd v. Scudder Kemper Investments, Inc., 741 N.E.2d 47, 51 n.5 (Mass. 2001); (2) a 1999 district court case that allowed joinder for non-signatory defendants which were "closely affiliated" with the NSAD member and the claims against both groups were "inextricably intertwined," Paul Revere Variable Annuity Ins. Co. v. Thomas, 66 F.Supp.2d 217, 225 (D.Mass. 1999), aff'd, Paul Revere Variable Annuity Ins. Co. v. Kirschhofer, 226 F.3d 15, 18, 20-21 (1st Cir. 2000); and (3) Marciano v. MONY Life Ins. Co., 470 F.Supp.2d at 527.  (Docket Entry # 19).

741 N.E.2d at 49-50 (interpreting "associated person" to exclude corporate employer of plaintiff under NASD rule using language similar to FINRA Rule 13100(r)); see also Paul Revere Variable Annuity Ins. Co. v. Kirschhofer, 226 F.3d at 19-21.

Beyond asserting the fact that CMFG is not an "associated person" and can therefore not compel arbitration, Shen's opposition does not address defendants' argument that CMFG can *join* in the arbitration that CBSI can compel.[19] (Docket Entry # 23). Moreover, in a reply brief, defendants pointed out that Shen did not dispute that the other defendants, including CMFG, can join in the arbitration CBSI can compel. (Docket Entry # 31). Defendants also noted, correctly, that Shen did not attempt to distinguish Paul Revere Variable Annuity Ins. Co. v. Thomas, 66 F.Supp.2d at 225. Having had notice that she did not dispute or oppose the joinder argument, Shen did not address the argument as to CMFG at the hearing.[20] Shen's decision not to oppose the

---

[19] Shen adds that, "Defendants even admit in their motion that CMFG cannot compel Ms. Shen to arbitrate her claims but that CMFG can merely join in an arbitration of such claims. This admission demonstrates that, as to CMFG, Defendants' Motion to Compel Arbitration and Stay Proceedings is entirely without merit." (Docket Entry # 23). The admission, if any, that CMFG can merely join in the arbitration, however, does not address defendants' actual argument regarding joinder on the basis of closely affiliated defendants and intertwined claims.

[20] At best, Shen globally asserted that, except for CBSI, none of the other defendants can or should be subject to arbitration. This global argument does not address the specific argument as to joinder of CMFG.

Separately, citing a First Circuit case, Sourcing Unlimited, Inc. v. Asimoco Int'l, Inc., 526 F.3d 38, 47 (1st Cir. 2008), defendants' reply brief alludes to the equitable estoppel doctrine. Although this court expresses no opinion on the

joinder argument as to CMFG therefore appears, to a degree,
deliberate and intentional.  Accordingly, solely on the basis of
a deliberate waiver by Shen, CMFG may join the arbitration that
CBSI, as well as Halevan and Collins, can compel.  See Vallejo v.
Santini-Padilla, 607 F.3d 1, 7 & n.4 (1st Cir. 2010)
("[p]laintiffs have not cited a single authority in support of
their assertion that their failure to timely oppose the motion to
dismiss did not constitute waiver" and noting that the decision
was deliberate); Coons v. Industrial Knife Co., Inc., 620 F.3d
38, 44 (1st Cir. 2010) ("district court was 'free to disregard'
the state law argument that was not developed in Coons's brief");
Federal Deposit Ins. Corp. v. Caporale, 931 F.2d 1, 3 (1st Cir.
1991) ("FDIC argued explicitly that the Caporales were personally
liable due to their failure to specify the capacity in which they
had signed the promissory notes" and, in opposing summary
judgment, Caporales "failed to argue that Elizabeth signed in her
capacity as trustee" or offer evidence that capacity was a
factual dispute); Collins v. Marina-Martinez, 894 F.2d 474, 481 &
n.9 (1st Cir. 1990) ("issues mentioned in a perfunctory manner,
unaccompanied by some effort at developed augmentation, are
deemed waived"); Paterson-Leitch Co., Inc. v. Massachusetts Mun.

---

doctrine's application (nor does Shen), Form U-4 containing the
arbitration agreement is not the same contract that Shen
presumably relies on (Docket Entry # 21-1, p. 16) in bringing the
Wage Act and breach of good faith and fair dealing claims.  See
Machado v. System4 LLC, 28 N.E.3d 401, 409-11 (Mass. 2015); see
also InterGen N.V. v. Grina, 344 F.3d at 145.

<u>Wholesale Elec. Co.</u>, 840 F.2d 985, 990 (1st Cir. 1988) ("party has a duty to put its best foot forward before the magistrate: to spell out its arguments squarely and distinctly").

III. <u>Stay</u>

As a final matter, defendants move to stay litigation on counts I and II during the pendency of the arbitration proceeding.  Shen objects to a stay and maintains that concurrent proceedings will not hinder arbitration and will avoid later, duplicative proceedings.  She also points to the "substantial burdens of proof," particularly with respect to the employment discrimination claims, and that delaying these proceedings will increase those burdens due to the passage of time.  (Docket Entry # 23).

Section three of the FAA governs the availability of a stay and reads as follows:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.  Section three therefore "'requires a federal court in which suit has been brought "upon any issue referable to arbitration under an agreement in writing for such arbitration" to stay the court action pending arbitration once it is satisfied that the issue is arbitrable under the agreement.'"• <u>Large v.</u>

Conseco Fin. Servicing Corp., 292 F.3d 49, 52 (1st Cir. 2002)
(quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S.
395, 400 (1967) (quoting 9 U.S.C. § 3)); see also HIM Portland,
LLC v. DeVito Builders, Inc., 317 F.3d 41, 43 (1st Cir. 2003)
("[t]o facilitate arbitration agreements, the FAA provides that
when a federal court reviews an issue that is subject to an
arbitration agreement the court shall, on the motion of one of
the parties, stay its proceedings until 'arbitration has been had
in accordance with the terms of the agreement'") (quoting 9
U.S.C. § 3)); Baggesen v. Am. Skandia Life Assurance Corp., 235
F.Supp.2d 30, 32 (D.Mass. 2002) (to stay proceedings, "Court must
find that a written agreement to arbitrate exists between the
parties, the dispute in question falls within the scope of that
agreement, and the party seeking arbitration has not waived its
right to arbitration").

Here, there was a written agreement to arbitrate.  The
disputes regarding counts III through VII are arbitrable and fall
within the scope of the arbitration agreement.  See generally
Puerto Rico Tel. Co., Inc. v. U.S. Phone Mfg. Corp., 427 F.3d 21,
28 n.4 (1st Cir. 2005) (section three "has been interpreted to
require a stay of litigation between the parties to the
arbitration agreement when the subject of the litigation is
within the scope of the agreement"), abrogated on other grounds
by Hall St. Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576
(2008).

There is also no "default" within the meaning of section

three.  A "'default'" is "generally" viewed "as including a
'waiver.'"● Marie v. Allied Home Mortg. Corp., 402 F.3d 1, 13
(1st Cir. 2005); see also Cutler Associates, Inc. v. Palace
Constr., LLC, 2015 WL 5569987, at *6 (D.Mass. Sept. 22, 2015)
(whether "party has waived its right to arbitrate by litigation
conduct is a question for the court, not the arbitrator").  "In
determining whether a conduct-based waiver has occurred," the
court examines "whether there has been an undue delay in the
assertion of arbitral rights and whether, if arbitration
supplanted litigation, the other party would suffer unfair
prejudice." Joca-Roca Real Estate, LLC v. Brennan, 772 F.3d 945,
948 (1st Cir. 2014).  The inquiry is informed by various factors.
See In re Citigroup, Inc., 376 F.3d 23, 26 (1st Cir. 2004)
(setting out relevant factors to assess in determining waiver of
arbitration); Cutler Associates, Inc. v. Palace Constr., LLC,
2015 WL 5569987, at *6 (outlining various factors to consider in
deciding a litigation conduct waiver).

Here, defendants promptly sought to compel arbitration and
stay the non-arbitrable claims after they removed the action to
this court.  Defendants did not engage in any meaningful
discovery before moving to compel arbitration.  They also did not
delay in exercising their arbitral rights.  The lack of any delay
or meaningful discovery detracts from any showing of prejudice.
Cf. Joca-Roca Real Estate, LLC v. Brennan, 772 F.3d at 950
("[t]he longer the delay and the more extensive the
litigation-related activities that have taken place, the stronger

33

the inference of prejudice becomes"). Accordingly, defendants are "not in default" within the meaning of section three.

Finally, Shen's assertion that proceeding concurrently will avoid later duplicative proceedings and save the parties time and money does not avoid a stay. First, as a means to show prejudice, it is not convincing. Any added costs of proceeding in the arbitral forum and thereafter litigating the discrimination claims in this forum were bargained for by Shen. See Commercial Union Ins. Co. v. Gilbane Bldg. Co., 992 F.2d 386, 391 (1st Cir. 1993) ("any added costs that Gilbane would incur to arbitrate its counterclaim were bargained for by Gilbane"). Even if it is inefficient to proceed in one forum and thereafter another, avoiding later duplicative proceedings does not warrant a denial of the requested stay under the FAA. See id. at 391 & n.8 ("considerations of judicial efficiency are not a sufficient basis on which to affirm the district court's denial of the motion to stay" and citing Second Circuit case holding that court may not deny stay pending arbitration based on judicial economy). In the alternative, it is not inefficient to stay these proceedings during the pendency of arbitration because of the overlapping nature of the issues, as pointed out by defendants. (Docket Entry # 19, p. 15). Indeed, concurrent proceedings may be duplicative and risk inconsistent adjudications. See United States v. Consigli Constr. Co., Inc., 873 F.Supp.2d 409, 417-18 (D.Me. 2012) (stating "[i]t would be duplicative and risk inconsistent adjudications to allow Maverick to pursue its Miller

34

Act claim against FIC in this Court simultaneously with its claims against Consigli in arbitration").

CONCLUSION

In accordance with the forgoing discussion, this court **RECOMMENDS**[21] that the motion to compel arbitration of counts III through VII and stay the proceedings on counts I and II (Docket Entry # 18) be **ALLOWED** and that this case be stayed during the pendency of the arbitration.


      /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[21]  Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection should be included.  See Fed.R.Civ.P. 72(b).  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.